Case 23-1970, Iesha Mitchell et al. v. City of Benton Harbor, MI et al. Argument not to exceed 15 minutes for the plaintiffs and 15 minutes to be shared by the defendants. Counsel, you may proceed for the appellants when ready. Good afternoon, your honors. Melanie Daly on behalf of the plaintiff's appellants, Iesha Mitchell et al. I've reserved five minutes of my time today for rebuttal. Fine. Thank you. May it please the court. Reversal of the district court's denial of plaintiff's bodily integrity claim against the city and state defendants warrants reversal for three reasons. First, circumstances matter. The role of the city and state defendants and what they knew through these roles elevates their conduct in this case to conscious shocking. Second, the defendants' actions in the Benton Harbor water crisis do not have to match the actions of the Flint defendants in the Flint water crisis exactly in order for this court to find conscious shocking behavior here. Girton and its progeny set forth categories and subcategories that these defendants' conduct fall in. Those categories include concealing and prolonging the water crisis. All of the city and state defendants here fall into those categories. And finally, this court's recent decision in Brazel v. Whitmer, authored by your honor Judge Moore, warrants reversal of the city and state defendants' dismissal in this case. I'd like to talk about these themes by addressing first some of the allegations against the defendants in this case. So we have two groups of defendants here. We have the city defendants and the state EGLE defendants. Both exhibited conduct that prolonged and concealed the Benton Harbor water crisis. The EGLE defendants prolonged the water crisis by making dangerous choices for corrosion control. They approved and implemented an untested polyphosphate corrosion inhibitor called Keras 3800. They also allowed it to be administered without the appropriate safeguards required by the EPA guidelines and state and federal State Water Drinking Act. Can I ask you a quick question about that? So I know that EGLE had some debate within their office, as I understand it in the record. I know we're basing this on the complaint, but they had concerns about how effective this Keras 8600 would be in terms of addressing, you know, anti-corrosion efforts. But is there any indication that, like, their actions would rise to the level of, like, being recklessly disregarding, you know, safety or deliberately indifferent? I mean, it looks like they had different views. It's an accepted corrosion inhibitor, whatever you want to call it. I mean, what takes this to that level of being, you know, deliberately indifferent? Yes, Your Honor. And here I think it's very important to look at the circumstances of what the EGLE defendants knew at the time that they started their conduct. So first, generally, they knew that the Benton Harbor water treatment plant was in a state of deficiency. It wasn't in compliance. In October 2018, they knew, and this is in the record at Exhibit 4, page 281, they knew that there were findings of significant deficiency that allowed potential contamination to be introduced into the water. They knew that the Benton Harbor water system had tons of lead surface lines. Only 2% were known to not have lead. And they also knew that there were a lot of internal plumbing components that had lead. Those are major danger factors. With respect to the corrosion inhibitor specifically, addressing Your Honor's question, they knew that EPA guidelines said, if you have a community like Benton Harbor, where you have a lead level exceedance, like they did in October 2018, and you have lead surface lines, you need to take into account special considerations. If you're going to consider the use of a polyphosphate, which the EPA specifically explains, sometimes increases corrosion control and increases lead levels, which is exactly what happened here when lead levels continued to rise. So they were aware of these considerations. Even worse, Oswald and Onan, the EGLE defendants, they did, quote, tons of work to implement this untested corrosion inhibitor, and they were given a specific warning by internal engineers. So engineers said to them, we're looking at the permit, the initial permit that lets the Keros-8600 into the water, and we're concerned because in communities like Benton Harbor, where there are lead surface lines and exceedances, we usually use an orthophosphate. Interestingly, the orthophosphate was key to what ended up fixing the Flint water crisis, something that all of these defendants knew through history. They watched the Flint water crisis unfold, and over 18 months they saw the damage that rising lead levels can do, irreversible damage to plaintiffs that it can do. And so ‑‑ So was there a problem that they approved this and then didn't realize that it was not working and in fact was making the situation worse, and then they didn't stop it? Or is it every level of their decision‑making that you're saying is deliberate indifference? Yes, Your Honor. From the moment that they were warned, first of all, they had initial knowledge that a polyphosphate should not be used in this situation, or if it is used, it should be used after the use of a corrosion control study. So in the face of that knowledge, in addition with knowing what happened in Flint, they were deliberately indifferent and consciously disregarded the risk of feeding a polyphosphate into the system. Then they were on that specific notice from their internal engineer. So their first decision in February 2019 to implement this KERES polyphosphate into the system, that was their first opportunity. They ignored the warning. And this is very similar to Prisby and Bush in the Girton and Wade cases who ignored warnings that the Flint water treatment plant wouldn't be ready to use the Flint river water. At the outset of the crisis in Flint, there was a decision made to use the Flint water treatment plant. They ignored warnings. That prolonged the crisis. Here at the outset ‑‑ But that started the crisis. Using the Flint water is what created the crisis in the first place. So that introduced the danger. This is something different. They didn't create this danger. Your Honor, they didn't create the danger in the sense that there wasn't a catalyst of a switch of water source like there was in Flint. That's exactly right. But the reason that the lead leached into the water in Flint is because of improper corrosion control. Lake Huron was being treated with orthophosphates historically. They switched to the Flint river using a defunct water treatment plant. And they failed to implement proper corrosion control. If they had used an orthophosphate, then the problem could have been abated. Here, although there was no switch, the moment that they saw a lead level exceedance, the decision to go with polyphosphate rather than orthophosphate and disregard known guidance, known statutes. Guidance, right. So you said at certain times that the EPA required the water supplier to conduct a study before introducing a CCT like this one. But that's just guidance, right. So I mean it just sounds to me like a case of negligence. Like they should have made a different decision and they didn't. And you're trying to sue them for deliberate indifference with the benefit of hindsight. Why is that not the case? Yes, Your Honor. I think in these cases we have instruction from the Supreme Court and Lewis that says what might be conscious shocking in one circumstance may not be conscious shocking in another. And it demands an exacting analysis of the circumstances. So really the prior knowledge that these defendants have of the Benton Harbor water treatment plant is in disarray. It has the potential to introduce contaminants into the water supply. The knowledge that they had about what the amended Safe Water Drinking Act told them, which was amended specifically to address the crisis that happened in Flint, which also suggested that they should use a corrosion control study. And although Your Honor is exactly right, the EPA guidance is just guidance. In a conscious shocking deliberate indifference analysis, we are looking at what did they know? What were they privy to? And I think that that's very important in this case in elevating the conduct. They also knew what had happened in Flint. And so in this position, when they found that there was increase in lead in October 2018, they saw that they had a time to act. They knew that at that time they had to tell, they should tell the people, be extremely transparent, don't drink the water. They should immediately implement optimized corrosion control, which they did not. And they should address the deficiencies at the water treatment plant. And so these are problems in their decisions. And I see that. You focused entirely on the state defendants. What about the city defendants in particular? Why did the district judge rule the way she did vis-a-vis O'Malley and Muhammad in this case and differently in the other case? In the district court, there were two complaints, our complaint and the Brazel complaints that were very similarly pled. As to O'Malley, the district court found that our indication that O'Malley lied to one resident by saying the water is safe at first flush, one statement is not enough. However, that was incorrect because you can plausibly infer from our allegations in paragraph 198 and 202 and 61 and Exhibit 5, where we say that his conduct, O'Malley's conduct, downplaying, misleading the residents, plural, constitutes conscious shocking behavior. And the same exact specific evidence that this court relied on in Brazel to find that O'Malley had conscious shocking conduct, we have that same exact evidence in our case. And so under Brazel, you should reverse the district court's order as to O'Malley. And I see that my time is almost up. I'd like to just briefly address the other two city defendants here. So in your Honor's decision in Brazel, Muhammad was found to not have conscious shocking conduct. We have a different situation here. Brazel said that the Brazel plaintiffs did not have a specific allegation against Muhammad. Here we do have a specific allegation. We allege that he downplayed the crisis at a crucial moment, right after the first border exceedance. A press conference is held to tell the citizens, this is what's happening. You're going to get a letter in the mail. It's going to talk about lead levels, and it's going to tell you what recently happened with the exceedance. Don't worry about it. It's not a 911 emergency. It's just an FYI. We do point to that specific allegation. And additionally, as I mentioned earlier, this analysis demands an exacting analysis of all the circumstances. And we have an additional circumstance that was not before the court in Brazel, and that is our allegations against city manager Darwin Watson. Darwin Watson was not on appeal in Brazel, although they did bring claims against him in the district court. At that same conference... The clerks can tell me, when it's red, that means they're going over by two minutes, correct? Yes. Okay, so you have used up two minutes of your rebuttal time. Yes. I don't know if you wish to do that. I'll just finish with Watson, and then I'll entertain any questions from the panel. So the additional circumstance that elevates Muhammad's conduct is our allegation against Darwin Watson, who at that same press conference, while his colleague, Muhammad, is saying, don't worry about it, it's not a 911, it's not an emergency, Watson lies to the people of Benton Harbor and says, and we don't even have lead service lines. And he knew that to be incorrect, as alleged on paragraphs 148 and 149, because there was just a grant a few months prior given to the city to replace lead service lines. So those two statements together compound the effect of telling the people of Benton Harbor, this is not a high degree of risk, and in light of the fact that any level of lead can cause harm, it should have absolutely been, this is a 911 emergency. Thank you. Thank you. So just to clarify the timers for everyone else in the courtroom. When it's green, you're good. When it's yellow, your time is running out. When it hits red, that means stop. Correct, Your Honor. Great. Thank you. Sure. Good afternoon, Your Honors. May it please the Court, Rebecca Smith on behalf of Defendants Clark, Oswald, Onan, and Sarcopato. I want to start by pointing out that this Court's recent decision in Brazil affirms what we knew from the Guertin case. To make out a plausible bodily integrity claim like the one the plaintiffs raised, you need shocking, constitutionally repugnant conduct. As stated in Guertin, you need truly heinous action to give rise to a constitutional claim mere negligence will not do. My clients are state regulators who do not operate the Benton Harbor water plant, did not cause the lead exceedance in Benton Harbor, and are instead arm's-length regulators who did nothing but try to support the city in reducing lead. They don't fit the mold in the Brazil and Guertin cases. Well, Brazil didn't, at least at the court of appeals level, was only dealing with the city defendants. That is correct, and that is because the state defendants were dismissed by the trial court. Well, it was because we had a limited appeal on qualified immunity, so the court of appeals never got to that. Your opponent has argued that the state defendants were disregarding known risks and choosing the wrong technology and that this does rise to the level of deliberate indifference, so if you could respond to that. Yeah, that is not the case at all when you look at the record and the complaint allegations in this case. It's true that the water plant in Benton Harbor had deficiencies. This was honestly and accurately noted by EGLE staff. Ernest Sarchipato did a sanitary survey noting the nature of these deficiencies and raising the concern that they could cause contamination, and the state defendants did not ignore this concern. Instead, they issued an administrative consent order to order them to bring the water plant back into compliance. The same goes with the corrosion control study. Under the Safe Drinking Water Act, I'd point out it's not state regulators or any of the individual defendants in this case. It's important to note, too, that the plaintiffs did not sue EGLE. They sued only four individuals who worked for EGLE. None of those individuals selected the corrosion control, and everything they were provided in approving the permit for corrosion control showed that it would be effective. Who selected the corrosion control? Under the Safe Drinking Water Act, it's the water supply that initially selects the corrosion control, so it would be the city in conjunction with Elhorn Engineering, who was working with the city at that time. And then the state defendants have to approve the permit. They approve a permit for it after reviewing the application, and everything submitted with this application indicated that this was a corrosion control product that was commonly used, that effectively reduced corrosion in pipes, that effectively reduced corrosion in potable water coming from pipes, so they had no reason to think that it would be ineffective in this case. Moreover, the state defendants in approving the permit ordered a corrosion control study to take place as the corrosion control was adopting, so it was being monitored for effectiveness. It was being monitored to make sure that it would work. This corrosion control study is not required. As this court pointed out when discussing things with opposing counsel, their guidelines on the Safe Drinking Water Act doesn't mandate a study, but one was ordered here in the permit and in the ACO. So EGLE's staff took responsible measures to ensure that corrosion control was quickly implemented, and the reason this was ordered, you know, the studies were ordered simultaneous to the treatment, was so that corrosion control could be put into place as quickly as possible in order to lower the lead as quickly as possible. It shouldn't be lost that city and state officials worked months ahead of the guidelines and deadlines within the Safe Drinking Water Act to implement corrosion control as quickly as possible in order to lower lead levels as quickly as possible. Given the state's concerns about this KRAS 8600 at various points, it seems like it would have made sense to have more monitoring of some sort that would have been overseen by the state, because I know there was testing done several times, and it seems like the lead levels were going up, not going down. It certainly was not getting better. It seemed like it was getting worse. Just wondering, you know, when it goes to this issue of negligence versus reckless disregard, I mean, why wouldn't the state have taken more actions to ensure, like, better monitoring? I think the state did do the monitoring that it could. The EPA guidance, as well as the Safe Drinking Water Act, contemplate corrosion control studies, and that's exactly what occurred here, and they were memorialized in several places in order for them to be put into effect as quickly as possible. And then when that monitoring showed that the corrosion control was working, but maybe not working as quickly as everyone expected, then the corrosion control was modified in order to more quickly remediate lead. There's nothing shocking in conduct in trying to get lead levels down, and over time investigating and ensuring that the proper corrosion control is used and modified to be even more effective over time. And I do want to point out that lead was, in fact, declining in Benton Harbor. You can see this even in the attachments to the complaint. They cite to a letter drafted by one of my clients, Brandon Onan, in February of 2020, which did request revised corrosion control, but indicated that what had been in place was working. It just wasn't working as quickly as ideal, and so it was modified on that basis. Exhibit 16 of the complaint has records from the city showing that lead levels started declining as early as 2019. Obviously, it took some time to bring things back into compliance with the Safe Drinking Water Act, but the corrosion control that was adopted from the outset was working and was simply improved over time. Before I run out of time, I do want to point out very quickly that a lot of the complaint allegations against my clients in particular do not address their actions with the corrosion control. They address, you know, plaintiffs seem to have completely pivoted their argument on appeal here, and a lot of the arguments they make with regard to the corrosion control are not the same as the allegations, and many of the paragraphs they rely on in their briefing, when you go back and forth, don't even actually address my clients specifically. So I do not think that they have made out a valid claim and that the trial court was correct in dismissing the case under Rule 12b-6. Unless the court has any questions, I see I only have about 14 seconds, so I can rest there. But bottom line, it's the State Defendant's position that the trial court got this correct and the appeal should be dismissed. Thank you. Thank you. Good afternoon, Your Honors. Thomas Freeman on behalf of the City of Benton Harbor, Mayor Marcus Muhammad, Michael O'Malley, and Darwin Watson. We're asking that the district court be affirmed. I just want to point out the overarching theme of plaintiff's argument. Under their argument, if they don't stop immediately with the delivery of water after a finding of lead, then there's liability or there's going to be a finding of unconstitutional conduct. But there's no right to clean drinking water, and the lead and copper rules of the state and federal government do not require an immediate cessation of the delivery of water after testing for lead. There is a treatment program. There's planning. It's six to 12 months before they're even required to implement corrosion control. So the idea that we have to immediately stop is somewhat silly. I just want to start. You're representing O'Malley, among other people, right? Yes. So how do you justify taking that position here, given the Brazil case where O'Malley was, where the complaint against O'Malley was allowed to go forward? Well, I think that the complaint was allowed to go forward. It's an unpublished decision. I would ask the court to reach a different result here. On O'Malley, we're dealing with a constitutional claim. We know that. The standards are unquestionably higher. Consider, for example, the panel's conclusion on O'Malley. So you're saying, in other words, that we would have to overturn our prior decision in Brazil in order to rule for O'Malley? I don't think that's necessarily true. I think there's different allegations here compared to Brazil. That's what I'm asking. What is the difference that allows you to make the argument that we should treat O'Malley differently here? Well, I think I can make the argument either way because I do think it's unpublished, and there's no need to follow the Brazil case. I do think that the facts are very similar. I'd like to focus the court's attention on the allegations. So I feel like you are waffling around the answer. Are you saying that this is the same as in Brazil, and we were just wrong in Brazil? Or are you saying it's different from the facts in the Brazil case? Are the complaints different? And if so, how? I think there's slight nuances, but I think overall they're very similar. So I don't mean to waffle. They're very similar. Okay, so you're saying we should overturn the prior panel decision. I don't think we need to overturn the prior panel decision. I would just reach a different result in an unpublished case. I want to focus on Izimarra, which the panel relied on significantly in that case. That same allegation is actually before the court. It's in ECF 1-4. This is where the only statement that's actually attributed to O'Malley is where he told residents, well, actually Izimarra, he told Izimarra that the city, i.e., him, the city, was telling plaintiffs that it's okay to drink their water after first flush or after letting it run for a few minutes. For starters, this is a standing problem. Ms. Marra is not a plaintiff. There's no allegation that any plaintiff heard this. And that creates a standing problem because to have an injury, an injury in fact, the statement must affect plaintiff in a personal and individual way. That's not what happened here. And also, this statement is not necessarily conscious checking. It's one statement at the outset of the crisis. It says it's okay to drink water after first flush. But the law provides, like I was just talking about, the law doesn't say that we have to immediately cease delivery of water. The law says that we have to test and come up with a plan. The EPA even recommends that it's safe and acceptable to flush the lines in order to reduce your exposure to lead. That's what O'Malley was saying. Just addressing the facts on flushing lines, is there a question about how many minutes you need to flush a line in order to have the lead dissipate? Is that an issue? Because my understanding of what O'Malley said was just let it run for a short minute or less. And then you can drink it. I don't think there's a question as to how long you should run. He said it was two minutes, three minutes, or four minutes would be better. Obviously, he has said and the record shows that the longer you run the lines, you reduce your exposure to lead. I think that's important. But I do want to contrast with O'Malley. And this is where I think it sets it apart from other defendants in the Gorton cases. O'Malley said this, but there's no allegation when he said it, he knew it was wrong. Contrast with the MDEQ defendants, Prisby and Bush. They were told by the Flint water operator it's not okay to send the water out. What did they do in response? They drafted a memo that said they're satisfied with the city's ability to treat the water. There's a major difference. There's no knowledge here that they plead of O'Malley that he knew what he was saying when he said flush the lines is improper. That's a major difference. Bush further lied to the EPA and the Flint. That Flint had said that they had optimized corrosion control, but they knew none was being used. There's a big difference between. So I'm curious about O'Malley. What is his role in the city? He's the water plant supervisor, is that right? Correct. So should he know what constitutes safe water or not? Whether he should know or not is not the standard. We're dealing with a constitutional standard. And the conscious shocking standard requires that he actually know it and that he acted despite it. So it's not what he should have known. I think there's a very important nuance there because he's not charged with generally what happened in Flint. He's charged with actual knowledge. That's how we get to the egregious behavior of a constitutional violation that violates substantive due process. He has to have actual knowledge, and he has to act despite that knowledge. And there's no allegation that he had the knowledge. He may have had general awareness. Maybe he should have had it, like the panel in Morsev, but that's not enough. I want to turn briefly to the other two defendants because I think it's really important. Two of the things that I said, Mohammed, I agree with the panel in Brazil, nothing but conclusive allegations that he downplayed it here, said this isn't 9-1-1. That's exactly what the federal government said. On Watson, and I think this is very important, plaintiffs say, and they repeat it here, he falsely told the public that there was no lead service lines. That allegation was just repeated here. It's in their brief. It is completely disingenuous. If you look at footnote 37 of the article that they reference in their own complaint, I'm sorry, footnote 19, and this is very important. Watson said, this is from the article that they attached to their complaint and can be considered in context here. Watson said the city has no lead lines. The very next sentence, quote, what we're finding is that the connection from the water main to the home service line are where we're finding the lead show up. To say that he lied when there was no lead lines is completely disingenuous and lacks candor. That is not appropriate. I also want to touch on one part about the carers working ahead of schedule that O'Malley talked about. Again, there's a misrepresentation about what he's saying. At footnote 37, if you actually look at what he said to the City's Recreation and Safety Committee, he said the results look, quote, kind of favorable. And he admitted in the very same sentence that he had only tested 7 out of 60 houses. He didn't lie. There's no allegation that he knew to the contrary. They are trying to create something that is from nothing. Saying that results look kind of favorable after admitting to only testing 7 out of 60 houses when there's no allegation that this is false or that he knew to the contrary is not a substantive due process violation and does not state a claim. Thank you. Mr. Curlew. Good afternoon to the panel. Douglas Curlew on behalf of Elhorn Engineering. I certainly appreciate the panel making accommodation to my current medical situation. I've spent a lot of time in hospital since my last appearance before the court in June. I really have nothing to add to the brief. I would just say the previous two defense counsel highlighted the primary reason why the state claims should not be considered alongside the federal claims. There's a great difference between the constitutional standard for review of liability and the state claim, professional negligence claim. In the Brazil case, already the court has justified dismissal and refused to exercise the supplemental jurisdiction over the state law claims. Due to that difference, it applies here as well. The claims are just not appropriate for the jury to consider together. If the panel has questions, I can answer. Any questions? Thank you. Thank you very much. Certainly. Okay, we have a little bit of time for rebuttal. I'd like to address first a general theme raised by my colleagues on the side of the state and the city. The state said everything indicated it was good in the permit when referring to CARES 8600. That is essentially arguing that their decision to approve a dangerous, untested corrosion inhibitor was based on reliance that everything was good. Specifically in Girton and Wade, the court said those are questions of fact reserved for after discovery and not appropriate, the motion to dismiss stage. Although it's nice to hear that the EGLE felt everything was fine, that is not an appropriate consideration at this time. Also, lead levels did not go down. Lead levels, the number of homes that were above the 90th percentile did fluctuate one or two or three over the course of the three-year crisis. But the sample size of the homes tested also changed, and that's important to consider. Lead levels, the highest lead level went up from 60 parts per billion in 2018 to 440 parts per billion in 2020 to 889 parts per billion in 2021. So clearly this crisis was prolonged and extended. And 889 is over 50 times the EPA's action limit of 50 parts per billion. That was actually recently just dropped down to 10 parts per billion. So to say that everything looked good and lead levels went down, those are questions of fact not appropriate at this stage. As to the city, specifically as to O'Malley, our allegations are exactly the same. The district court found that one statement's not enough, but we can plausibly infer, as the court did in Brazel, that this reached more than one plaintiff. We have specifically alleged standing. We allege a concrete injury on paragraph 369, and we connect that to O'Malley's conduct on 61. There is clearly standing here. And finally, knowledge is not actual knowledge at this stage. Awareness can be inferred, and the court in Iwaski v. City of Brunswick tells us that we can prove circumstantially by evidence suggesting that defendants have been exposed to important knowledge. And here we absolutely know that through the allegations put in the complaint and the history of the Flint water crisis. Thank you. Thank you. Thank you all for your argument. The case will be submitted.